ACCEPTED
12-15-00137-CR
TWELFTH COURT OF APPEALS
TYLER, TEXAS
9/30/2015 5:38:41 PM
Pam Estes
CLERK

## No. 12-15-00137-CR

In the

## Court of Appeals

For the

## Twelfth District of Texas

At Tyler

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
9/30/2015 5:38:41 PM
PAM ESTES
Clerk

———————◆———————

## No. CR13-00337

In the 294TH Judicial District Court
Of Van Zandt County, Texas

———————◆———————

## MICHAEL VINCENT MOORE,
*Appellant*

V.

## THE STATE OF TEXAS
*Appellee*

———————◆———————

## DEFENDANT'S APPELLANT BRIEF

———————◆———————

JOHN A. SCOTT
State Bar No. 24034672
107 E. Tyler St.
Athens, Texas 75751
(903) 675-8005
Fax: 903-675-8006

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

Index of Authorities ................................................................................3

Statement Regarding Oral Argument.........................................................5

Identification of Parties.............................................................................5

Statement of the Case...............................................................................6

Issues Presented .......................................................................................6

Statement of Facts.....................................................................................7

Summary of the Argument.......................................................................26

Issue Number 1 ......................................................................................27

The evidence is legally insufficient to support Appellant's conviction for the offense of capital murder.

Argument for Issue Number 1 .................................................................28

Issue Number 2 ......................................................................................47

Because the State's capital murder case was a circumstantial evidence case, and because Appellant had no motive to murder Alicia, the evidence presented supports an inference other than the guilt of Appellant and the jury's finding of guilt was not a rational finding

Argument for Issue Number 2 .................................................................47

Issue Number 3 ......................................................................................50

The aggregate effect of erroneous rulings by the trial court in allowing the jury to hear objectionable and inadmissible evidence irreparably harmed Appellant and Appellant should be granted a new trial.

Argument for Issue Number 3 ....................................................................................50

Conclusion and Prayer ..............................................................................................55

Certificate of Service ...............................................................................................55

Certificate of Compliance………………………………………………………56

Appendix………………………………………………………………………… 57

## INDEX OF AUTHORITIES

CASES:                                                                                    Page

*Brandley v. State*, 691 S.W.2d 699,
    (Tex.Cr.App.1985)………………………………………………………48, 49

*Brooks v. State,* 323 S.W.3d 893,
    (Tex. Crim. App. 2010) (plurality opinion) ..............................................27

*Carlsen v. State*, 654 S.W.2d 444,
    (Tex.Cr.App.1983)………………………………………………………48, 51

*Coble v. State*, 330 S.W.3d 253,
    (Tex.Cr.App.2010)………………………………………………………51

*Cover v. State*, 913 S.W.2d 611,
    (Tex. App.—Tyler 1995, pet. ref'd) ..........................................................46

*Denby v. State*, 654 S.W.2d 457,
    (Tex.Cr.App.1983)………………………………………………………47, 48

*Flores v. State*, 551 S.W.2d 364,
    (Tex.Cr.App.1977)……………………………………………………… 48

*Garcia v. State,* 495 S.W.2d 257,
    (Tex.Cr.App.1973)……………………………………………………… 47

*Jackson v. Virginia,* 443 U.S. 307,
    61 L. Ed.2d 560, 99 S. Ct. 2781 (1979) ...........................................27,47,48

*Johnson v. State,* 967 S.W.2d 410
    (Tex. Crim. App. 1998).............................................................................27

*Llamas v. State*, 12 S.E.3d 469,
    (Tex. Crim.App.2000)...............................................................................53

*Lockhart v. Nelson,* 488 U.S. 33,
    102 L. Ed. 2d 265, 109 S. Ct. 285 (1988)................................................27

*Montgomery v. State*, 820 S.W.2d 372, 378-79
    (Tex.Crim.App.1990)................................................................52

*Motilla v. State*, 78 S.W.3d 353, 355,
    (Tex.Crim.App.2002)................................................................53

*Muniz v. State,* 851 S.W.2d 238
    (Tex. Crim. App. 1993)................................................................27

*Skelton v. State*, 795 S.W.2d 162,
    (Tex.Cr.App.1989)................................................................47, 48

*Stahl v. State*, 749 S.W.2d 826,
    (Tex.Crim.App.1988)................................................................50, 54

*Williams v. State*, 840 S.W.2d 449,
    (Tyler App.1991) ................................................................53

RULES:

TEX. PEN. CODE § 19.03……………..…………………………………..28

TEX. PEN. CODE § 22.01……………………………………………………44

TEX. PEN. CODE § 22.021……………………………………………………..44

TEX. RULES. EVID. 402……………………………………………………51

TEX. RULES. EVID. 403……………………………………………………51, 53

TEX. RULES. EVID. 901……………………………………………………53

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. RULE 39, the Appellant waives oral argument.

## IDENTIFICATION OF THE PARTIES

Pursuant to TEX. R. APP. P. 38.2(a), a complete list of the names of all interested parties is provided below so that the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of the case.

Counsel for the State:

> **Chris Martin**—District Attorney of Van Zandt County and Attorney for State at Trial
>
> **Richard Schmidt**—Assistant District Attorney at Trial

Appellant or Criminal Defendant:

> **Michael Vincent Moore**
>
> Appellant is incarcerated

Counsel for Appellant:

> **John A. Scott** –Counsel at trial / Counsel on appeal
> 107 E. Tyler Street, Athens, Texas 75751

Trial Judge:

> **Hon. Teresa Drum** — 294TH Judicial District Court Judge
>
> County Courthouse 121 E. Dallas St., Suite 301, Canton, Texas 75103

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEALS:**

**STATEMENT OF THE CASE**

On July 30, 2013, in Cause No. CR13-00337, Michael Vincent Moore (hereinafter "Appellant") was indicted for the offense of capital murder, alleged to have occurred on or about November 6, 2012. (C.R. 9)

The case was tried before a jury and Appellant pled not guilty to the offense. On the court's charge, the jury returned a verdict of guilty to capital murder, and the Court assessed a punishment of Life in the Institutional Division of the Texas Department of Criminal Justice without parole. (C.R. 8, 205, 219). Appellant filed a Motion for New Trial and Motion in Arrest of Judgment. (C.R. p. 230). Appellant's motion was denied pursuant to T.R.A.P 21.8 when the Court did not timely rule on the motion within 75 days.

**ISSUES PRESENTED**

1. The evidence was legally insufficient to support Appellant's conviction for Capital Murder. Based upon the evidence presented to the jury, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—specifically, that Appellant intentionally and knowingly caused the death of Alicia Moore by strangulation and that the Appellant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault of Alicia Moore. There was no evidence that Appellant strangled and murdered Alicia Moore. At the very most, the State proved that Appellant committed the offense of

6

sexual assault. Therefore, the case should be remanded to the trial court for a new trial.

2. Because the State's capital murder case was a circumstantial evidence case, and because Appellant had no motive to murder Alicia, the evidence presented supports an inference other than the guilt of Appellant and the jury's finding of guilt was not a rational finding.

3. The aggregate effect of erroneous rulings by the trial court in allowing the jury to hear objectionable and inadmissible evidence irreparably harmed Appellant and Appellant should be granted a new trial.

## STATEMENT OF FACTS

**Jessica Byrd** testified. Jessica is the aunt of Alicia Moore, the victim in this case. (16 R.R. 30-31) Deborah Moore is Jessica's mother. (16 R.R. 30). Jessica is married to Kenneth Byrd. (16 R.R. 30). In November of 2012, Jessica, Kenneth, Aretha, Deborah, Alicia, and a great uncle, Michael Wofford, were all living in the same home in Greenville located at 1900 Gibbons Street. (16 R.R. 31-32). Appellant, Michael Moore, is Jessica's uncle. (16 R.R. 34). Alicia was 16 at this time (16 R.R. 38). Jessica last saw Alicia Thursday night at the residence. (16 R.R. 42). Jessica and Kenneth were moving into a new home in Greenville and they had left to spend the night at their new residence that night. (16 R.R. 30-42).

On November 2, 2012, Jessica got home from work at 7 p.m. and Alicia was not

home yet and did not get off the school bus at 7:00. (16 R.R. 42). Alicia did not have a cell phone at this time and she communicated with her iPad. (16 R.R. 44). Deborah and Aretha went to the Greenville Police Department to file a missing person's report. (16 R.R. 50). Jessica called Appellant and let him know and he seemed concerned his response was "just like everybody else, just keep them updated of what's going on." (16 R.R. 54, 104). On November 6, 2012 many family members were at the house and they had a big prayer on the porch and Appellant was there. (16 R.R. 69). Jessica is not sure when Appellant arrived, it could have been 5:00 or 6:00 p.m. or it could have been before that. (16 R.R. 69). She got a text from Appellant saying he was on his way to the home but she does not have that phone anymore. (16 R.R. 69). Appellant's demeanor was just like everyone else that was there. (16 R.R. 70). Michael Wofford's demeanor was hard to read because he is an alcoholic. (16 R.R. 70).

On Wednesday morning, November 6, the family learned that Alicia's body had been found. (16 R.R. 70). The Byrd's new home was less than a 5 minute drive from the Gibbons home. (16 R.R. 79).

That Summer—approximately 4 months before her disappearance—Alicia was having sex with an 50 year old man named Terry Ramsire. (16 R.R. 80). Ramsire is related to Kenneth Byrd. (16 R.R. 95). Terry Ramsire was charged with sexually assaulting Alicia, who was 16. (16 R.R. 82-83). Alicia was also viewing pornography at the home and the family had to block the pay-per-view channel because of a high bill. (16 R.R. 84). She may have been viewing pornography on Jessica's computer, and the police took this computer during the investigation. (16 R.R. 84-85). While at home, Alicia was usually on her iPad, on which she had access to Facebook and other social media sites,

8

and an "app" that allowed her to text with the iPad. (16 R.R. 86). The family did not monitor her conversations. (16 R.R. 86).

On the Friday that Alicia disappeared, Deborah, Aretha, Kenneth, and Jessica were all at work. (16 R.R. 87). Only Mike Wofford was home all day. (16 R.R. 87). He is an alcoholic who drinks during the day and does not work. (16 R.R. 87-88). At the time of trail, Mike Wofford was living in Dallas—he moved out of the Gibbons home not longer after Alicia's death. (16 R.R. 107). From actions prior to trial, Jessica said Mike was being evasive about coming to the trial and she suspected Mike knew more about "what happened that day." (16 R.R. 109, 114). Jessica watched a video of Alicia getting of her school bus that day and the time was 3:30 p.m. (16 R.R. 89).

Jessica testified that on Thursday night, the following people were at the home: Jessica, Kenneth, Deborah, Aretha, Michael Wofford, and Alicia. (16 R.R. 91). On Monday November 5th, Jessica went to the Greenville Police Department and suggested that the police interview Tobias Whetstone as a possible suspect or lead. (16 R.R. 92-94).

Appellant Michael Moore lived in Grand Prairie. (16 R.R. 95). Appellant moved to Grand Prairie to take care of Paul Moore, his father. (16 R.R. 96). Paul was in an assisted living facility and Appellant got him out of it and they moved into a home together. (16 R.R. 96). Paul was almost always at the house in Grand Prairie and rarely accompanied Appellant on the trips to Greenville. (16 R.R. 105). Appellant is gay and the family knew this. (16 R.R. 102). Appellant drove to Greenville to visit the family every other weekend. (16 R.R. 97). He would spend time with the family and help out around the house. (16 R.R. 97). Alicia would be there and she never saw anything

9

unusual between Appellant and Alicia. (16 R.R. 97).

On Tuesday November 6, Appellant sent Jessica a text that he was coming to Greenville to be with the family, but she does not remember the time the text was sent. (16 R.R. 98). Although Jessica showed this to the police, they never bothered to collect this evidence or photograph it. (16 R.R. 102). Sending a text before he made the drive was his habit. (16 R.R. 97-98). Jessica knows for sure that Appellant was in Greenville at the home when the police chief came to ask for dental records but she is not sure what time he got there. (18 R.R. 21). That night, when Appellant was driving home, his vehicle had mechanical issues and he came back and borrowed Aretha's vehicle. (16 R.R. 98). Kenneth had to go to where Appellant was on I-30 and follow him back to Greenville because of the mechanical issue. (16 R.R. 99). Appellant's truck was old and a small two-door, bluish/purple color. (16 R.R. 99).

Jessica testified that Appellant and Alicia were close. (16 R.R. 114). Appellant would visit the family in Greenville just about every other weekend. (18 R.R. 22). Appellant was teaching her how to bake cupcakes. (16 R.R. 114). Alicia once drove with Appellant to Grand Prairie so that she could spend the night with a relative named Sheila. (16 R.R. 112-113). Jessica never observed anything inappropriate with the relationship between Appellant and Alicia. (16 R.R. 112, 115). Alicia never indicated that Appellant had been inappropriate with her. (16 R.R. 115).

On recall by the State, State Exhibit No. 72 was introduced through Jessica—a letter written by Appellant where he says the DNA evidence linking him to Alicia was planted. (18 R.R. 19). Jessica and the family did not have any friends or relatives in the Wills point area and she is not aware of Appellant having any either. (18 R.R. 20).

10

Jessica has never seen the trunk that Alicia's body was found in the home at 1900 Gibbons nor had she seen it at Appellant's home nor any wicker furniture similar to the trunk. (18 R.R. 24).

**Aretha Moore**, Alicia's mother, testified on behalf of the State. (16 R.R. 135, 137). Alicia was a junior in high school and she road the bus to school at around 6 or 6:30 a.m. and got out of school after 3:00 p.m. (16 R.R. 139). She and Alicia had moved in the home at 1900 Gibbons in Greenville in May of 2012. (16 R.R. 139). Mike Wofford also lived in the house and he did not work and was constantly at the house. (16 R.R. 141). Everyone else living in the house had a job in November of 2012. (16 R.R. 142). Every other adult in the home worked for Wofford would be the only one at home when Alicia got off the bus at 3:30 p.m. (16 R.R. 175). Aretha knows that Alicia got off the bus at 3:30 the day she disappeared because the school bus had a video showing her getting off then. (16 R.R. 175). Aretha believes that Wofford was trying to evade coming to the trial to testify. (16 R.R. 176).

Aretha testified that Appellant was considered Alicia's uncle and he and Alicia had a good relationship. Appellant "spent time being an uncle…buy things, hang out together, cook," with Alicia. (16 R.R. 142).

On Friday, November 12, the day that Alicia disappeared, her mother Deborah spent the night with Jessica and Kenneth in their new house so only Aretha, Mike Wofford, and Alicia were in the home that morning. (16 R.R. 147-149). Aretha and Deborah ran errands that day and they got to the house after 5:00 p.m. (16 R.R. 151). Alicia was not home at that time. (16 R.R. 151). Only Mike Wofford was home. (16 R.R. 151-152). When Alicia was not there, she assumed she was at the ACE

(afterschool) program. (16 R.R. 152). The family started looking for Alicia when she was not home by 7:30 or 8:00 p.m. (16 R.R. 152, 173).

Ramsire, the man who Alicia was having sex with that Summer, was arrested, prosecuted, and sent to prison. (16 R.R. 161). Alicia had a school-owned iPad that she communicated and texted with. (16 R.R. 155). Aretha did not monitor the conversations that Alicia had on it, she left that to Jessica. (16 R.R. 164).

Aretha drove a Chevrolet Cobalt. (16 R.R. 170). Jessica and Kenneth also had vehicles. (16 R.R. 170).

The State called **Michael Wofford** to testify. (16 R.R. 178). Mike is 62 and lived in South Dallas at the time of trial. (16 R.R. 178-179). He is a great-uncle to Aretha and Jessica and Deborah is his niece. (16 R.R. 179). He was living in the home at 1900 Gibbons in November of 2012 and had spent the Summer there. (16 R.R. 181). When Alicia went to the school bus that Friday morning, that was the last time he saw her. (16 R.R. 194). Mike was home all day—he "just stayed at the house." (16 R.R. 194). Aretha came to the house that day for lunch for approximately 25 minutes, but then Mike was home alone for the rest of the day until Aretha and Deborah came home around 5:00 p.m. (16 R.R. 213). Mike never left the house that day and he stayed home when everyone else was out looking for Alicia. (16 R.R. 215).

Mike stated that Alicia normally got home around 3:30 and that he would be alone with Alicia until Deborah got home around 20 to 25 minutes later. (16 R.R. 215-216). However, this day Deborah didn't get home until 5:00 p.m. (16 R.R. 216).

Mike recalled Appellant having mechanical issues with his truck on November 6. (16 R.R. 221). After Appellant "left the house, his truck ran hot. He called the house and

12

me and Kenneth Byrd went and followed him back to the Gibbons house…." (16 R.R. 221). There was an issue with the radiator and Kenneth and Mike helped Appellant work on it. (16 R.R. 221).

On Wednesday when the police arrived and said they had found Alicia, Mike and others, including Appellant, were sitting on the porch at some time between noon and 3:00 p.m. (16 R.R. 226-227). When the State asked to clarify if he was there, the following exchange took place:

> "Q: And you were there at the house all day that day?
> A: Yes. All of us were there that day. Didn't nobody go anywhere.
> Q: If it's been represented that you were off walking around somewhere, is that not …true?
> A: Oh, if I was waking, I went to the - - to the store around the corner…..
> Q: Okay. So it's possible that you did leave the house during these days- -
> A: It could - - it could have - - yeah. If I did, I didn't have to walk. There was so many cars that one of them could have took me, you know…."
> (16 R.R. 228).

Mike said that Appellant was there and had driven to the Gibbons home early that morning : "he was there that morning. He came early that morning." (16 R.R. 228). Mike said that Appellant had a good relationship with Alicia. (16 R.R. 228). Appellant would take her to the store and buy cake mixes because he was teaching her how to bake. (16 R.R. 229). They would just be gone long enough to go to the store and back. (16 R.R. 229). He never noticed anything unusual about Alicia when they would return from the store. (16 R.R. 229).

**Deborah Moore**, mother of Aretha and Jessica, was called to testify by the State. (16 R.R. 231-232). Appellant is her brother. (16 R.R. 232). In 2012 She lived at 1900 Gibbons in Greenville, Texas. (16 R.R. 234). Every adult living in the house worked

13

except for Mike Wofford. (16 R.R. 236). During the day, after everyone went to work and Alicia went to school, Mike would be the only one at the house. (16 R.R. 236). Jessica and Kenneth had lived with her for a couple of months because they were "in between moving." (16 R.R. 237). Alicia would hardly speak to Mike because she was very shy and stayed to herself. (16 R.R. 238). Mike and Alicia never did things together. (16 R.R. 238).

Deborah testified that Appellant and Alicia had a "very good relationship." (16 R.R. 240). "[H]e's just been there ever since she's a little girl…they didn't see each other much because we were here in Texas. He was in California…but when Alicia was little, her and her mother would take trips to California to visit." (16 R.R. 240). Appellant moved to Texas to take care of their father, Paul Moore, who lived in Grand Prairie, Texas with Appellant. (16 R.R. 240-241). According to Deborah, Appellant would come to Greenville and "just sit around and talk and he will do work around my house or he'll go visit my cousin." (16 R.R. 241). He also spent time with Alicia teaching her to bake, and one or two times they went to the store together. (16 R.R. 241-242). The two seemed fond of each other and there was nothing that gave her any concern of anything inappropriate going on. (16 R.R. 242).

On the morning of November 2, 2012, Deborah was not at home as she normally would be because she spent the night at Jessica's new house because "they was expecting cable put in." (16 R.R. 242). So on the night of November 1st, going into the 2nd, Jessica, Kenneth, and Deborah stayed at the new home. (16 R.R. 243). Deborah testified as follows:

> "Q: Do you know who was staying at your home on the 2nd, that morning?
> A: It would have been her [Alicia] and Uncle Michael [Mike Wofford].

14

Q: Okay. And was Aretha also staying there?

A: Yes - - ….but she probably - - I think she had left for work."

(16 R.R. 245).

Deborah was suspicious about Mike Wofford being involved with Alicia's disappearance because "he would have been the last one that saw her when she got home from school." (16 R.R. 254). Deborah questioned Mike about this and he said Alicia never made it to the house that day, but even after this she was still suspicious of Mike. (16 R.R. 254). If Alicia did arrive home that day, she would have been alone with Mike for about 45 minutes. (16 R.R. 254, 263). She did not understand why Mike "couldn't clarify that she hadn't come home…because the school bus stop is just a short distance from my house, and he said he never did see her." (16 R.R. 256).

Aretha had a Chevy Cobalt and she kept the keys at the house when she went to sleep. (16 R.R. 264). Deborah would go to bed early and Aretha would go to be around midnight. (16 R.R. 265).

Deborah was not aware of any plans Alicia had for that Friday when she disappeared and she did not have permission to go anywhere. (16 R.R. 247). Deborah does not recall what weekend Appellant was at the home after Alicia went missing, but his behavior seemed no different than usual. (16 R.R. 252). One time Alicia rode with Appellant to Grand Prairie to see a cousin Sheila that lived there. (16 R.R. 253).

Deborah and Jessica went to the Greenville Police Department about Alicia's disappearance and Deborah asked the police to look into Tobias Whetstone because she believed him to be a suspect based upon some information that was given to her. (16 R.R. 265-266). The police never came and removed items from her house for testing or analysis. (16 R.R. 267). The police did not collect any DNA swabs for testing from the

15

home or from Aretha's vehicle. (16 R.R. 267). A computer was taken from the house but the police never informed her if anything was found on it. (16 R.R. 269).

The police showed Deborah a photo of the black whicker trunk that Alicia's body was found in and she testified she did not recognize the trunk and that it did not come from her home. (16 R.R. 261). She never saw Appellant with the trunk either. (16 R.R. 261). Deborah has been to Appellant's home in Grand Prairie and she did not see the trunk there. (16 R.R. 262). She never saw Appellant spray painting any objects around her home at the time of Alicia's disappearance. (16 R.R. 262).

**Texas Ranger Michael Adcock** testified on behalf of the State. (17 R.R. 7). He was told that a Texas Department of Transportation (hereinafter "TXDOT") workers had discovered a "wicker-style trunk, and inside that trunk was the nude body of a young black female and it appeared that she had been strangled." (17 R.R. 21-23). The body was found approximately 3 miles north of Wills Point on FM 47 near the guardrails close to a small bridge on the side of the road. (17 R.R. 21). The trunk had a "two-piece hasp on it. One of the [TXDOT] worker removed a…key ring that was holding the hasp together closed….The other worker used a stick and opened the lid of the trunk and discovered the female's body inside." (17 R.R. 23).

Ranger Adcock testified that the body had ligature marks around her neck and throat area and bruises and abrasions. (17 R.R. 30, 33). Ranger Adcock took steps to preserve as much evidence as he could. (17 R.R. 31-32). The body was in a stage of rigor mortis and appeared to be in the "first stage of coming out of rigor mortis…." (17 R.R. 32-34).

When the body was removed from the trunk, the words "nigger whore" were

16

spray painted in the bottom of the trunk in black. (17 R.R. 35-36). That spray paint color appeared consistent with the color of the outside of the trunk. (17 R.R. 36). On the lid of the trunk a backwards swastika spray-painted. (17 R.R. 37). The Ranger thought this could indicate a hate crime but the swastika being backwards caused him to doubt that. (17 R.R. 102). The Ranger believes that the trunk had recently been painted with two different kinds of spray paint—a flat black and a glossy black. (17 R.R. 101). Some overspray was detected on the silver hasp. (17 R.R. 101). The trunk was not an ordinary household item and had some pretty distinctive features—including the latch and the gold paisley design in the interior. (17 R.R. 104). Neither Deborah, Jessica or Aretha recognized the trunk. (17 R.R. 105). No evidence was found during the investigation that the trunk had been purchased by the family members, Appellant, nor anyone else. (17 R.R. 107). The trunk was sent to the Lab for analysis and no fingerprints were located. (17 R.R. 109).

An autopsy was ordered and the body was sent to the Southwestern Institute of Forensic Science (hereinafter "SWIFS") in Dallas. (17 R.R. 42). Ranger Adcock observed trauma to both the anus and the vagina. (17 R.R. 43). The M.E. advised that the death would be ruled "a homicide, homicidal violence due to strangulation." (17 R.R. 43).

The Ranger believed that Alicia was using several apps on the iPad to communicate, including TextNow, MocoSpace, Facebook, and others. (17 R.R. 49). Tobias Whetstone was reported to be Alicia's boyfriend, so he was contacted and specimen of his DNA was obtained. (17 R.R. 52) Terry Ramsire, who was in jail for sexually assaulting Alicia, was interviewed as part of the investigation. (17 R.R. 53,

17

172). Ramsire was being prosecuted for this and Alicia was the key witness. (17 R.R. 171). Ramsire was related to Kenneth Byrd. (17 R.R. 172). "We had an individual that contacted Channel 8 news out of Dallas and advised that he had killed Alicia and that he was paid $5,000 by…the mother of Alicia to kill her. We attempted to set up a meet with him….He didn't show up…. (17 R.R. 54). The Ranger ruled this out because of "the way that he worded the e-mail" and there was "no motive for her mother to pay $5,000 to have her killed…." (17 R.R. 54). It was also reported that two individuals "kidnapped Alicia, took her to a house there in Greenville, sexually assaulted her, knocked her teeth out and strangled her and then dumped her body," but this lead was ruled out as well. (17 R.R. 55). These men were Omes and Adrian Gray. (17 R.R. 172). Information obtained through Alicia's social media sites indicated that "she might have gone to Paris", Texas. (17 R.R. 55).

Two and a half month later, Ranger Adcock got what he believed to be a break in the case when the DPS Lab reported to have a DNA match to Appellant. (17 R.R. 56-59).

Appellant's Phone Records

The Ranger subpoenaed Appellant's phone records and the Court allowed the Ranger to testify about them over objection from Appellant. (17 R.R. 81; S.E. No. 27). The Ranger testified that these records do not necessarily incriminate Appellant, they merely indicate periods of phone inactivity. (17 R.R. 83). The phone records do not contain text messages because the records indicate that if the records are not requested within 60 days of the texts the messages will be overwritten or lost. (17 R.R. 174). The records showed no indication that Appellant was calling Alicia. (17 R.R. 175-176). The ranger did a cell phone tower investigation to see what cell towers Appellant's phone was

18

pinging off of during this time. (17 R.R. 176). Appellant's phone never pinged off of any location in Van Zandt Count. (17 R.R. 176). There is nothing in Appellant's phone records to indicate he was ever in Wills Point during the time of Alicia's disappearance. (18 R.R. 159). If Appellant had used his phone in Van Zandt County, there are cell phone towers there that it would have pinged off of. (17 R.R. 176). Furthermore, on November 2, 2012, the date that Alicia disappeared, Appellant's phone never pinged off any towers in the Greenville area. (17 R.R. 177). Appellant's phone only pinged off towered in the Grand Prairie and Irving area that day. (17 R.R. 177). The Ranger believes that Appellant picked up Alicia on November 2 and had her in his custody until her body was found on November 6. (17 R.R. 177). The phone records show that Appellant was using his phone on November 2, 3, 4, 5 and 6th. (17 R.R. 159, 178). Appellant made approximately 8 calls on the 3rd and there were several incoming calls made to his phone that day too. (17 R.R. 179). On the 4th Appellant made approximately 10 outgoing calls and had about 5 incoming calls to his phone. (17 R.R. 179). On November 5th Appellant made approximately 11 calls and had 2 incoming calls. (17 R.R. 179). On November 6th, the phone pinged off the Greenville cell tower at 12:36, but never on any Van Zandt county tower. (18 R.R. 159).

The drive from Grand Prairie where Appellant lived to Greenville takes approximately an hour and fifteen minutes. (17 R.R. 136). Interstate 30 takes you from Grand Prairie to Greenville. (17 R.R. 136). At no point does I-30 pass through Wills Point, near where the body was found. (17 R.R. 137).

Search of Appellant's Home

A search warrant was run on Appellant's home at 417 Oakview Street in Grand

Prairie and his truck. (17 R.R. 119-131). The Ranger was looking for blood in the form of splattered droplets, smears and pools that could have been evidence of a bleeding injury or some type of violent trauma—none was found. (17 R.R. 125). He was looking for any type of bludgeons, clubs or any type of weapon that could have been used in Alicia's death. (17 R.R. 125). Two crowbars were collected and submitted to the lab but no link was made to Alicia. (17 R.R. 126). The Ranger was looking for items that could have caused the ligature marks on Alicia's body, including ties, bindings, ligatures, and ropes. (17 R.R. 127). Some twine and scissors were found and sent to the lab for analysis and no link was made to Alicia. (17 R.R. 127-128). The Ranger was also looking for computers, disks, DVDs and a Gateway tower computer was seized. (17 R.R. 129). The Ranger was looking for evidence of communications between Alicia and Appellant and the computer was sent off for analysis and the Ranger was not aware of anything was located. (17 R.R. 129). During the search warrant execution, the Ranger was looking for clothing and items, including the iPad and orange backpack she had when exiting the bus, that belonged to Alicia—none were found. (17 R.R. 129-131, 138). The Ranger was looking for shavers, clippers, scissors, knives, rags, washcloths or towels capable of shaving and cleaning the body postmortem. (17 R.R. 139). Scissors and nail clippers were collected but the lab found no link to Alicia. (17 R.R. 139). The Ranger's was looking for semi-gloss or flat black spray paint that could have been used to paint the recently painted black whicker trunk. (17 R.R. 140). Four cans of spray paint were seized as evidence; however, the lab determined that these were not used to paint the whicker trunk. (17 R.R. 141). The Ranger was looking for signs of paint or overspray that could have cause some markings or transfer on any surfaces indicating that the

20

wicker trunk was actually at or sprayed at the residence or in Appellant's vehicle. (17 R.R. 141). Nothing was located that linked Alicia's death to Appellant. (17 R.R. 141-142). Black markings in the bed or Appellant's truck were ruled out by the lab. (17 R.R. 142). Appellant's vehicle was small blue Nissan truck. (17 R.R. 143). During the search of the home, the Ranger was looking for a similar metal hasp like the one attached to the trunk or packing or receipts showing that Appellant may have purchased this item—none was found. (17 R.R. 144). The Ranger searched for any kind of paper trail linking Appellant to this crime—none was found—no receipts, credit card information, etc. (17 R.R. 144). It is possible that the trunk could have been part of a wicker furniture set, but no similar items were located during the search. (17 R.R. 145-146). Because the crime was of a sexual nature, the Ranger was also looking for bedding, pillowcases, cushions, and bedding, and several of these items were collected and sent to the lab for analysis; however, no DNA nor blood or any other evidence was found to link these items to Alicia. (17 R.R. 146-148). No blood evidence was found belonging to Alicia or linking Appellant to Alicia's death. (17 R.R. 149). No personal hygiene items—toothbrush, hairbrush, makeup, etc.—were found in Appellant's home. (17 R.R. 149).

The Ranger believes that at some point Appellant transported Alicia in his truck to Wills Point where her body was found. (17 R.R. 150). Only one vehicle was located at Appellant's house during the search and the Ranger found nothing in his investigation to lead him to believe Appellant had access to another vehicle. (17 R.R. 150). The interior of the truck was searched but nothing was found linking Appellant to Alicia. (17 R.R. 151). The police may have checked videos from businesses in Wills Point to see if the Appellant could be seen in any of them but nothing showing Appellant was located. (17

R.R. 154).

The Ranger is not aware of any extensive search like the one that was conducted on Appellant's home being conducted on the home at 1900 Gibbons. (17 R.R. 157). The Ranger has no knowledge of anyone searching the Gibbons home for any spray paint, weapons, ligatures, blood or DNA evidence, silver metal hasps, receipts to the trunk or hasp, bedding and sheets. (17 R.R. 157-158). Alicia's bed was not searched to see if there were signs of any sexual activity in it. (17 R.R. 189).

Ranger Adcock testified that the Greenville Police interviewed a boy named Tobias Whetstone who was reported to be dating Alicia and who was initially a suspect. (17 R.R. 160) He was arrested during the investigation on an unrelated charge and he made the statement that the "only reason he was being arrested is because that skanky ass bitch is dead." (17 R.R. 160).

Additional suspects were Omes Gray and Adrian Gray. (17 R.R. 163). These are the men whom were reported to have "kidnapped Alicia, took her to a house there in Greenville, sexually assaulted her, knocked her teeth out and strangled her and then dumped her body," but this lead was ruled out as well. (17 R.R. 55, 172-173). Multiple people had given information to Greenville PD that Omes and Adrian Gray were involved with Alicia's death. (17 R.R. 163). These men were linked to a white Lincoln that was located in Greenville that was at a residence in close proximity to where Alicia lived. (17 R.R. 164-166). The white Lincoln was also of importance because "we received information from somebody over here in Van Zandt County that they observed a white Lincoln in the area of where the whicker trunk was found." (17 R.R. 165). The witness also stated that the white Lincoln had pop-up headlights. (17 R.R. 166). The

22

Lincoln in Greenville that was searched had this type of headlights. (17 R.R. 166). There was enough probable cause for a search warrant to be issued for this Lincoln. (17 R.R. 164). Items were removed during the search and the FBI handled them but the Ranger is aware of no findings being issued. (17 R.R. 165). The Ranger was told that they did not find anything but he did not verify this for himself. (17 R.R. 167).

The Ranger testified that a man named Dee Williams contacted WFAA news in Dallas through their Facebook account and claimed to have killed Alicia. (17 R.R. 167). Dee Williams' Facebook page had a photograph of himself on the page. (17 R.R. 168). The Ranger is not aware of any attempts by law enforcement to get records from Facebook about the identity of Dee Williams or to trace the IP address of the computer that Dee Williams was using in order to ascertain his identity. (17 R.R. 169, 188).

A forensic examination of the 2 computers taken from 1900 Gibbons showed no link to Appellant. (17 R.R. 170). The police had no eyewitnesses claiming to have seen Appellant with Alicia during the time of her disappearance. (17 R.R. 191). There were no leads coming in regarding Appellant. (17 R.R. 191).

**L.P. Phillips**, a reporter with CBS radio, KRLD, who interviewed Appellant in jail, testified on behalf of the State. (18 R.R. 28). In the interview, Appellant denied committing the offense charged. (S.E. No. 76). Appellant told Phillips that Appellant never left his home on November 2 because his truck was broken down that Friday. (S.E. No. 76).

**Amber Moss**, a forensic scientist who works at the DPS Lab in Garland, testified on behalf of the State. (18 R.R. 70). She received and tested a sexual assault kit (hereinafter "SANE kit") taken from the body of Alicia by SWIFS and a testing of the

23

vaginal swabs showed that the "DNA profile from the sperm fraction was consistent with a mixture from the victim and the suspect [Appellant]." (18 R.R. 78-96). She did not receive nor test samples from Omes and Adrian Gray for testing. (18 R.R. 109). For the anal swabs, "no DNA foreign to the victim was detected…." (18 R.R. 99). Moss testified that "the debris swabs from…around the nipples from the victim we obtained a partial DNA profile from that sample that was consistent with the mixture from the victim and a second contributor, but due to that second contributor being so minor, we're not able to make any comparisons to that second contributor." (18 R.R. 101). Contamination of the tested samples is possible, and "for it to…have been contaminated, it would have had to been prior to us receiving it at the laboratory, so—because it was properly sealed when we received it at the laboratory. And in this instance, spermatozoa were observed on the sample, so it would have had to have been contaminated with semen from that individual. (18 R.R. 104).

The SWIFS sexual assault kit also contained fingernail clippings from Alicia. (18 R.R. 110-111). There was no DNA foreign to Alicia on her fingernails. (18 R.R. 112). Appellant's blue Nissan truck was taken to the laboratory and placed in a vehicle bay and examined. (18 R.R. 114). There was no semen or blood found during the search of the vehicle. (18 R.R. 114). Furthermore, all items submitted for testing from Appellant's home were negative for the presence of Alicia's DNA (18 R.R. 115-117).

Appellant called **Shenae Stephenson** to the witness stand. (18 R.R. 125). Shenae lives in Greenville, Texas. (18 R.R. 125). On the afternoon of November 2, 2012, she was driving her car on Lee street getting ready to turn on Walnut. (18 R.R.

126). She was behind a school bus and the bus stopped. (18 R.R. 128). On the opposite side of the bus she notice a 4-door black truck with dark tint on the back windows and a bed cover coming from the opposite direction. (18 R.R. 128-129). Ranger Adcock testified that Appellant's pickup was a blue Nissan 2 door, does not have tint on the back window, and does not have a black bed covering. (18 R.R. 156). The bus let off a girl and as soon as she got off she observed the black truck make a quick turn and begin to follow the girl, really slow, and it looked suspicious, so "what I did, I drove around and made another quick turn, but I didn't see her." (18 R.R. 128-132). Before she lost sight of the girl, she got a good look at the girl and the driver. (18 R.R. 129, 131). The driver of the truck was a Hispanic male with black hair that was parted on the side. (18 R.R. 132). When asked if she saw Appellant, in the truck, she said "I didn't see a black man; I seen a Hispanic person." (18 R.R. 133). The truck was a 2010 or 2012 GMC truck, a newer model. (18 R.R. 134). She does not know if the girl got in the truck. (18 R.R. 130-134). Later, Shenae was watching the news and saw the girl's picture on the news—she was certain it was the same girl she had seen get off the bus. (18 R.R. 135-136). On November 7, 2012, she went to the police station to report that she had seen the girl and Hispanic male that was following her. (18 R.R. 135). She never heard back from the police and never shown any photo-lineup or asked to identify any vehicles.(18 R.R. 136).

25

## SUMMARY OF THE ARGUMENT

**Issue Number 1**

The evidence was legally insufficient to support Appellant's conviction for Capital Murder. Based upon the evidence presented to the jury, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—specifically, that Appellant intentionally and knowingly caused the death of Alicia Moore by strangulation and that the Appellant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault of Alicia Moore. There was no evidence that Appellant strangled and murdered Alicia Moore. At the very most, the State proved that Appellant committed the offense of sexual assault. Therefore, the case should be remanded to the trial court for a new trial.

**Issue Number 2**

Because the State's capital murder case was a circumstantial evidence case, and because Appellant had no motive to murder Alicia, the evidence presented supports an inference other than the guilt of Appellant and the jury's finding of guilt was not a rational finding.

**Issue Number 3**

The aggregate effect of erroneous rulings by the trial court in allowing the jury to hear objectionable and inadmissible evidence irreparably harmed Appellant and Appellant should be granted a new trial.

**ISSUE NUMBER 1**

The evidence was legally insufficient to support Appellant's conviction for Capital Murder. Based upon the evidence presented to the jury, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—specifically, that Appellant intentionally and knowingly caused the death of Alicia Moore by strangulation and that the Appellant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault of Alicia Moore. There was no evidence that Appellant strangled and murdered Alicia Moore. At the very most, the State proved that Appellant committed the offense of sexual assault. Therefore, the case should be remanded to the trial court for a new trial.

### *Legal Sufficiency*

The Texas Court of Appeals has determined that only one standard should be used to evaluate the sufficiency of the evidence in a criminal case: legal sufficiency. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality opinion). The standard of review for legal sufficiency is limited to determining whether, after viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979). In reviewing the sufficiency of the evidence, we consider all of the evidence, whether or not properly admitted. *Lockhart v. Nelson*, 488 U.S. 33, 41-42, 102 L. Ed. 2d 265, 109 S. Ct. 285 (1988); *see also Johnson v. State*, 967 S.W.2d 410, 411-12 (Tex. Crim. App. 1998). The Court of Appeals does not engage in a second evaluation of the evidence, but only ensures that the jury reached a rational decision. *Muniz v.* State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

27

## ARGUMENT

To prove the offense of capital murder as alleged in this case, the State needed to prove beyond a reasonable doubt that Appellant intentionally and knowingly caused the death of Alicia Moore by strangulation and that the Appellant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault of Alicia Moore. (C.R. 9) (also see TEX. PEN. CODE § 19.03). In viewing the evidence in a light most favorable to the verdict, there is insufficient evidence to support the jury's guilty verdict and a rational trier of fact could not have made such a finding based upon the evidence heard at trial. The State failed to prove a sufficient link to Appellant and the murder of Alicia. At most, the State proved the that Appellant committed the offense of sexual assault (as opposed to aggravated sexual assault), based upon the DNA evidence introduced at trial, and even that is dubious based upon the potential for contamination that the evidence was exposed to, as will be discussed later.

The primary reason the evidence was legally insufficient to support the jury's verdict was the complete lack of evidence presented at trial. There was no eyewitness who claimed to see Appellant with Alicia during the time of her disappearance and the police did not have a single call come in alleging Appellant was a suspect. (17 R.R. 191). The State's theory of the case is that Appellant picked Alicia up when she got off the bus on November 2, 2012, and held her in his custody, violently murdered her, and dumped her body off on the side of the road just north of Wills Point in Van Zandt County; however, the State presented no evidence to support this. (17 R.R. 150). No evidence in the trial ever placed Appellant in Wills Point or even Van Zandt county for that matter— no phone records, cell tower evidence, no surveillance footage, or receipts, etc.

28

Furthermore, Appellant denies his involvement in Alicia's death, as he did in the interview with CBS new reporter LP. Phillips. (18 R.R. 60, S.E. No. 76). Appellant told Phillips that Appellant never even left his home on November 2 because his truck was broken down that Friday. (S.E. No. 76). As will be discussed later, Appellant's phone records and cell tower evidence supports Appellant's claim.

### *The Lack of Evidence Found During the Search of Appellant's Home and Vehicle*

If Appellant had abducted Alicia, held her against her will, and violently murdered her, there would have been some evidence of this in his home and truck. A search warrant was run on Appellant's home. (17 R.R. 119-131). No blood or DNA belonging to Alicia was located in the extensive search. (17 R.R. 125). The body had ligature marks around her neck and throat area and numerous bruises and abrasions. (17 R.R. 30, 33). In a violent assault and murder such as this, one would expect to find blood in the form of splattered droplets, smears and/or pools that would evidence a bleeding injury or some type of violent trauma—none was found. (17 R.R. 125, 149). No weapons were found that had Alicia's DNA or blood on them. (17 R.R. 125-126). Alicia was strangled based upon the M.E.'s testimony and the ligature marks on her body and the Ranger searched for items that could have caused the ligature wounds on Alicia's body, including ties, bindings, ligatures, and ropes; however, nothing was found that could be linked to Alicia. (17 R.R. 127-128). No evidence was found in the search of Appellant's seized computer and cell phone that he was communicating with Alicia. (17 R.R. 129). Furthermore, nothing was found in the computers that were taken from Alicia's home showing the two were communicating. (17 R.R. 170). Considering the distance between where Appellant lived and Greenville, it would have been highly

unlikely that they could arrange a meeting like this without the aid of technology; however, the record was void of any text messages, phone calls, or computer communication between the two. None of Alicia's clothing or personal items, such as her iPad, orange backpack, or hygiene items such as toothbrush, make-up or combs were found. (17 R.R. 129-131, 138, 149). The trunk she was found in had recently been painted with two different kinds of spray paint—a flat black and a glossy black—so the Ranger was looking for semi-gloss or flat black spray paint that could have been used. (17 R.R. 101, 140). Four cans of spray paint were seized as evidence and tested and the lab determined that these were not used to paint the whicker trunk. (17 R.R. 141; Defendant's Ex. No. 2). Additionally, there were no signs of painting or overspray to indicate that the trunk was spray painted at the residence or in Appellant's vehicle. (17 R.R. 141). No metal hasp matching the one attached to the trunk or packaging or receipts showing that Appellant may have purchased the hasp was found. (17 R.R. 144). Considering the distance between Appellant's home, Wills Point, and Greenville, there should have been some kind of transaction history where Appellant purchased gas or other items used in commission of the crime; however, no paper trail of any kind was found to link Appellant to this crime—no receipts, credit card information, etc. (17 R.R. 144). The trunk did not match any other piece of furniture located during the search, and the State failed to produce any evidence linking Appellant to the trunk that Alicia's body was found in. (17 R.R. 145-146). Multiple family members were questioned at trial and not one testified that they had seen Appellant with the trunk or had seen the trunk at his home. Because the crime was of a sexual nature, the Ranger was also looking for bedding, pillowcases and cushions, and several of these items were collected and sent to

30

the lab for analysis; however, no DNA nor blood or any other evidence was found to link these items to Alicia. (17 R.R. 146-148). Appellant's blue Nissan truck was taken to the laboratory and placed in a vehicle bay and examined. (18 R.R. 114). There was no semen or blood found during the search of the vehicle. (18 R.R. 114). There was no evidence presented that Appellant had sex with Alicia in the home or in truck. Despite an extensive search of Appellant's home, nothing was located that linked Alicia's death to Appellant. (17 R.R. 141-142).

### Cell Phone and Cell Tower Evidence

Very often, the State obtains cell phone information and cell tower records that prove a suspect was in an incriminating location or was communicating with the victim prior to their death. The jury heard no such evidence in this case. The State introduced Appellant's MetroPCS cell phone records but the Ranger even testified that this evidence was not incriminatory but merely indicated periods of phone inactivity on the dates she went missing and the date that she was found. (17 R.R. 81-83; S.E. No. 27). The phone records in no way link Appellant to the murder of Alicia; however, they do provide further evidence that Appellant did not commit this crime—evidence that was wrongfully ignored by the jury. The records showed no indication that Appellant was calling Alicia. (17 R.R. 175-176). The records suggest that Appellant was never in Van Zandt county where the body was found because the phone never pinged off of any tower located in Van Zandt County, much less the tower closest to Wills Point. (17 R.R. 159, 176). If Appellant had used his phone in Van Zandt County, there are cell phone towers there that it would have pinged off of. (17 R.R. 176). Furthermore, on November 2, 2012, the date that Alicia disappeared, Appellant's phone never pinged off any towers in the Greenville

31

area. (17 R.R. 177). If Appellant was not even in Greenville on the day Alicia disappeared, as the phone records suggest, then it would have been impossible for him to pick her up when she got off the bus. Appellant's phone only pinged off towered in the Grand Prairie and Irving area the day she disappeared, which supports his statement that he never left Grand Prairie and had nothing to do with this crime. (17 R.R. 177; S.E. No. 27). This discredits the Ranger's theory that Appellant picked up Alicia on November 2 and had her in his custody until her body was found on November 6. (17 R.R. 177). The theory is further discredited because on November 6th, the phone pinged off the Greenville cell tower at 12:36, but never on any Van Zandt county tower. (18 R.R. 159). This supports Appellant's argument that it was not him that dropped Alicia's body off in Van Zandt County. This evidence casts more than reasonable doubt upon the State's allegations but the jury chose to wrongfully ignore this evidence as shown by their verdict. Additionally, the phone records showed Appellant actively used his phone by making and receiving calls during the time between Alicia's disappearance and her discovery on November 6. (17 R.R. 159-179). The phone records show that Appellant was using his phone on November 2, 3, 4, 5 and 6th. (17 R.R. 159, 178). On the 3rd Appellant made 8 outgoing calls and had several incoming calls; on the 4th he made 10 outgoing calls and had 5 incoming; on November 5th he made 11 outgoing calls and had 2 incoming. (17 R.R. 178-179). This active phone usage is not consistent with a person that has abducted someone, is secreting them, and brutally assaulting and raping them, and then disposing of their body. This phone usage reflects normal, everyday activity on the part of Appellant and provided reasonable doubt that made the evdidence legally insufficient and should have prevented the jury from returning a verdict of guilty to

32

capital murder.

*The Loving Relationship between Alicia and Appellant*

Appellant loved Alicia and wanted to help her, which is totally inconsistent with the actions of the person that committed this horrible crime. Appellant is a loving man who even moved from California to Texas in order to get his father out of an assisted living facility and care for him. (16 R.R. 96). Appellant was not exhibiting any strange behavior during the time of Alicia's disappearance, which you would expect to see from someone who had done this kind of crime. When Appellant arrived to comfort the family during the time of Alicia's disappearance, Jessica testified his demeanor was just like everyone else that was there. (16 R.R. 70). Jessica stated that Appellant and Alicia were close and she never saw anything inappropriate between Appellant and Alicia. (16 R.R. 97, 114). Jessica testified that Alicia once drove with Appellant to Grand Prairie so she could visit another relative and Alicia never reported that Appellant was inappropriate. (16 R.R. 112-113, 115). Deborah confirmed this as well. (16 R.R. 252-253). Aretha, Alicia's mother Aretha testified that Appellant was considered Alicia's uncle and he and Alicia had a good relationship. (16 R.R. 142). Mike Wofford also testified that Appellant and Alicia had a good relationship and that when they would go to the store to shop he never noticed anything unusual about Alicia when they returned. (16 R.R. 229). Deborah testified that the two had a "very good relationship," and that they seemed fond of each other and there was nothing that gave her any concern of anything inappropriate going on. (16 R.R. 240, 242). There was no testimony from any of the family members to show that Appellant was capable of such a cruel act, and this evidence should have provided further reasonable doubt to the jury. The only evidence the jury heard regarding

33

the relationship between Appellant and Alicia was that it was caring and loving one, and not in anyway inappropriate. If Appellant truly had committed capital murder, surely one of the family members would have seen some kind of warning sign, even if only in hindsight. But there was nothing at trial—the only suspicions regarding any family member was towards Mike Wofford, as will be discussed later. Furthermore, the jury turned a blind eye to the fact that Appellant is gay and that the entire family was aware of this. (16 R.R. 102). This horrible act was not the act of a gay man, but rather this was a killer that was attracted to women.

*Appellant's Lack of Ties to Location where Alicia's Body was Found*

Appellant had no link to Wills Point and no friends or relatives living there, so he would have been completely unfamiliar with the area and would have no reason to go there. (18 R.R. 20). It is hard to imagine that anyone would pick an unfamiliar setting such as this to dispose of a body, because of the risk of getting lost and getting caught. Furthermore, Appellant was having mechanical issues with his truck during this time, and it can be reasonably assumed that the truck was in no condition to make the kind of drive that would have been required to abduct Alicia from Greenville, return home with her to Grand Prairie, then drive all the way to Wills Point, and then back to Greenville. Appellant's statement to L.P. Phillips was that his truck was broken down on November 2 and he never left the house. (S.E. 27). Mike Wofford confirmed that Appellant was having mechanical issues with the truck on November 6. (16 R.R. 221). He testified that after Appellant "left the house, his truck ran hot. He called the house and me and Kenneth Byrd went and followed him back to the Gibbons house…." (16 R.R. 221). There was an issue with the radiator and Kenneth and Mike helped Appellant work on it.

34

(16 R.R. 221). And finally, the State searched for video footage that might show Appellant in the Wills Point area, but found nothing. (17 R.R. 154).

### *Suspect Mike Wofford*

The jury failed to consider the most obvious suspect for Alicia's murder, Mike Wofford (hereinafter "Mike"), and the evidence submitted to them on him alone should have been enough reasonable doubt for a rational jury to have acquitted Appellant—and for this reason the evidence was legally insufficient for capital murder. Whereas the evidence showed that Appellant was close with Alicia and wanted to help her self-esteem by teaching her to bake, the evidence was that Mike and Alicia had no relationship, despite them living in the same house. Deborah and Jessica testified that Mike and Alicia never did things together or spent time with each other. (16 R.R. 110, 238). Jessica testified that Mike's demeanor was hard to read because he is an alcoholic who drinks during the day. (16 R.R. 70, 87-88). It was well established that on the day of Alicia's disappearance, Mike was the only adult in the house not working and that he would have been home all day. (16 R.R. 87, 141, 194). Mike was the only one home when Alicia got off the bus at 3:30 p.m. (16 R.R. 175). The family members did not trust Mike, even at the time of trial. Jessica testified that she suspected Mike knew more about "what happened that day." (16 R.R. 109, 114). It was apparent that Mike had something to hide because Aretha testified that she believed Mike was trying to evade coming to trial to testify. (16 R.R. 176). Mike's behavior seemed strange as well during the time of Alicia's disappearance. Mike himself stated that while the other family members in the home were out looking for her, he just stayed at home. (16 R.R. 215). Additionally, Mike was caught in a lie about his whereabouts on November 6th, the day that Alicia's

35

body was found:

> "Q: And you were there at the house all day that day?
>
> A: Yes. All of us were there that day. Didn't nobody go anywhere.
>
> Q: If it's been represented that you were off walking around somewhere, is that not …true?
>
> A: Oh, if I was walking, I went to the - - to the store around the corner…..
>
> Q: Okay. So it's possible that you did leave the house during these days- -
>
> A: It could - - it could have - - yeah. If I did, I didn't have to walk. There was so many cars that one of them could have took me, you know…."
>
> (16 R.R. 228).

Mike further acknowledge that typically, when Alicia got off the bus at 3:30, he would be alone with her for at least 20 to 25 minutes until Deborah got home at her usual time. (16 R.R. 215-216). It was established at trial that on the day Alicia disappeared, Deborah didn't get home until 5:00 p.m., giving Mike approximately 45 minutes alone with Alicia. (16 R.R. 216). Another unusual occurrence that may have emboldened Mike was that Kenneth and Jessica had just moved out of the 1900 Gibbons home and into a new place the night before Alicia's disappearance. (16 R.R. 78-79, 16 R.R. 242). As a result of this, Deborah spent the night with Jessica at her new place the night of November 1, 2012. (16 R.R. 242-243). Less people in the house along with additional time before anyone came home that afternoon provided Mike with the perfect opportunity to abduct and murder Alicia. Even Deborah was suspicious of Mike's involvement because "he would have been the last one that saw her when she got home from school." (16 R.R. 254). Deborah even questioned Mike about this and he said Alicia never made it to the house that day, but even after this she was still suspicious of Mike. (16 R.R. 254). Deborah confirmed that if Alicia did arrive home that day, she would have been alone with Mike for about 45 minutes. (16 R.R. 254 ,263). She did not understand why Mike

36

"couldn't clarify that [Alicia] hadn't come home…because the school bus stop is just a short distance from my house, and he said he never did see her." (16 R.R. 256). At trial the State argued that Mike could not have disposed of Alicia's body because he did not have a car. However, it was established that Aretha had a Chevy Cobalt and she kept the car and the keys at the house when she went to sleep. (16 R.R. 264). Deborah would go to bed early and Aretha would go to be around midnight. (16 R.R. 265). Mike could have easily abducted Alicia when she got off the bus, secreted her body somewhere nearby, murdered her, and then, once Aretha and Deborah were asleep, taken the keys to the Chevy Cobalt and disposed of Alicia's body. It is clear from the evidence that Mike not only knew more about Alicia's disappearance, but that he had the best opportunity to have committed this crime. For the jury to find Appellant guilty after hearing this evidence regarding Mike is unfathomable, and is the sign of an irrational jury and therefore the evidence in this case was legally insufficient for Appellant to be guilty of capital murder.

*Additional Suspects*

Just as the police and the jury failed to consider Mike Wofford, they failed to consider other suspects in Alicia's death as well. Once the DNA match came back on Appellant, the police wrongfully narrowed their search to Appellant as their only suspect. (17 R.R. 56-59). The police and jury failed to consider the possibility that Appellant was set up or that he was only guilty of having consensual sex with Alicia, and that it was another suspect that actually killed her. Appellant has denied all wrongdoing in this case and has expressed his concern to the family that he was framed. (18 R.R. 19; S.E. No. 72). There was no evidence at trial that the police investigated this claim. Other than

Mike Wofford, there were other suspects that appeared much more culpable than Appellant. Take Omes Gray and Adrian Gray for example. These are the men whom were reported to have "kidnapped Alicia, took her to a house there in Greenville, sexually assaulted her, knocked her teeth out and strangled her and then dumped her body." (17 R.R. 55, 172-173). Shockingly, the lab testing the SANE kit in this case never even received samples from these men to make comparisons with. (18 R.R. 109). Multiple people had given information to Greenville PD that Omes and Adrian were involved with Alicia's death. (17 R.R. 163). These men were linked to a white Lincoln that was located in Greenville at a residence in proximity to where Alicia lived. (17 R.R. 164-166). The white Lincoln was also of importance because, as the Ranger testified, "we received information from somebody over here in Van Zandt County that they observed a white Lincoln in the area of where the whicker trunk was found." (17 R.R. 165). The witness also stated that the white Lincoln had pop-up headlights. (17 R.R. 166). The Lincoln in Greenville that was searched had these kind of headlights. (17 R.R. 166). This was no mere coincidence. There was enough probable cause for a search warrant to be issued for this Lincoln. (17 R.R. 164). Items were removed during the search and the FBI handled them but the Ranger stated he is aware of no findings being issued. (17 R.R. 165). The Ranger later said he was told that they did not find anything but he did not verify this for himself. (17 R.R. 167). When the Ranger is the lead investigator handling all the information and leads coming in on this case, should not it have been him to decide whether the evidence taken from the Lincoln was of importance? However, the police somehow ruled this lead out. (17 R.R. 55). This is one of the strongest leads the police received of Alicia's abduction and death, and for this to have been completely

ignored by law enforcement and the jury is unforgivable. This alone should be considered grounds for reversal for legal insufficiency of the evidence.

Another lead that was ignored was a confession to Alicia's murder. The Ranger testified that a man named Dee Williams contacted WFAA news in Dallas through their Facebook account and said he killed Alicia. (17 R.R. 167). He confessed that he committed the murder because he had been paid $5,000 by the mother of Alicia. (17 R.R. 54). The police went so far as to try and set up a meet with him but when that failed they decided that the confession was unreliable because of "the way that he worded the e-mail" and because there was "no motive for her mother to pay $5,000 to have her killed…." (17 R.R. 54). There was no motive for Appellant either but that did not stop the police from narrowing their investigation in on him and completely ignoring this confession. Dee Williams' Facebook page had a photograph of himself on the page. (17 R.R. 168). The Ranger is not aware of any attempts by law enforcement to get records from Facebook about the identity of Dee Williams or to trace the IP address of the computer that Dee Williams was using in order to ascertain his identity. (17 R.R. 169, 188). In this day and age, the technology is available to track down computer users and those who communicate through websites such as Facebook. Particularly in a case such as this, where the police's only evidence against Appellant was DNA evidence that proved at most that he had consensual sex with Alicia, more should have been done to track down Dee Williams and hold him responsible for Alicia's abduction and death. With this evidence hanging out there, no rational jury could have found all the elements of capital murder in this case, and thus the evidence was legally insufficient.

Of all the suspects in Alicia's murder, none had more motive to have her killed

than Terry Ramsire. Ramsire was in his 50s when he had a sexual relationship with 16-year-old Alicia just months before her death. (16 R.R. 80-83). He was charged with sexually assaulting her and was arrested and in jail at the time of her death. (16 R.R. 81-83, 161; 17 R.R. 53, 172). Obviously, Alicia was the key witness in his prosecution. (17 R.R. 171). Ramsire had all the motive in the world to have Alicia killed, but he was in jail, which is probably the key reason that he was ruled out as a suspect. But what the State failed to fully investigate is that he had a family member who up until the very day before Alicia's disappearance, lived in the same house as Alicia—Kenneth Byrd. Ramsire and Kenneth Byrd were related. (17 R.R. 172). It is not out of the realm of possibility that Ramsire could have had his relative Kenneth murder Alicia so that she would not be able to be a witness against Ramsire. And the timing was uncanny too, because it just happened to be the day after Kenneth moved out. The motive and opportunity here are undeniable—yet this too was ignored by the jury.

Another suspect was Tobias Whetstone. The Ranger reported that he was interviewed during the investigation because he was supposed to be dating Alicia. (17 R.R. 160). Even Jessica and Deborah told police from the beginning that he should be a suspect. (16 R.R. 92-94, 265-266). Deborah testified that she believed him to be a suspect based upon information that was given to her. (16 R.R. 265-266). He was arrested during the investigation on an unrelated charge and he made the statement to police that the "only reason he was being arrested is because that skanky ass bitch is dead." (17 R.R. 160). How could anyone other than the actual killer be so cold? These words alone were enough to give a rational jury reasonable doubt about whether or not Appellant committed capital murder.

40

There was evidence of a hate crime that was not properly investigated. On the inside of the trunk, the words "nigger whore" were spray painted in the bottom of the trunk in black. (17 R.R. 35-36). Additionally, on the inside of the lid of the trunk a backwards swastika was spray-painted. (17 R.R. 37). The spray paint that made these markings was not the spray paint found during the search of Appellant's home. (Defendant's Exhibit No. 2). The Ranger thought this could indicate a hate crime but the swastika being backwards caused him to doubt that. (17 R.R. 102). However, it is common knowledge that people that commit this level of hate crime are generally very ignorant people. It would not surprise anyone if the kind of uneducated racist who would commit this kind of crime would be capable of inverting the swastika. This aspect of the case should have been explored further to seek out additional suspects.

Realistically, there were probably countless predators that could have been suspects in this case. Alicia was engaging in very dangerous and high-risk behavior. In addition to sleeping with a 50 year old man, Alicia spent much of her time communicating on social sites. The Ranger believed that Alicia was using several apps on the iPad to communicate, including TextNow, MocoSpace, Facebook, and others. (17 R.R. 49). Alicia was addicted to sex, as is evidenced by the family's testimony that she was watching so much pornography at the house that the pay-per-view channel had to be blocked due to a high bill. (16 R.R. 84). She also may have been viewing pornography on Jessica's computer. (16 R.R. 84-85). No one in the family was monitoring the conversations Alicia was having online and through text messages. (16 R.R. 86). The investigation that police did into Alicia's online accounts led them to believe that "she might have gone to Paris," Texas, presumably to meet up with a man she met online;

however, this was insufficiently explored by law enforcement. (17 R.R. 55). The Ranger acknowledged that it is common for perpetrators to meet young women on online sites such as Facebook. (17 R.R. 152). It is also common for them to try to get personal information form victims on these sites such as where they live and go to school (17 R.R. 152). Sometimes older men will pretend to be much younger or even a different sex in order to prey upon girls online. (17 R.R. 153). Alicia's frequent use of these sites created an atmosphere where Alicia exposed herself the exactly the kind of harm that occurred. There was no evidence presented that Appellant was on these kinds of sites or communicating with Alicia on through these sites.

The State's evidence also suffered from a lackluster investigation. Besides not looking into all the leads and suspects that have been previously mentioned, law enforcement failed to adequately investigate key areas of the case, thereby giving the jury inadequate evidence to base a guilty verdict for capital murder on. Where the trunk had come from was not fully explored. The mechanical issues Appellant was having with his vehicle, thereby making it highly unlikely that he was able to drive to from Grand Prairie to Greenville, then to Grand Prairie, then to Wills Point, and then to Greenville again, were not fully investigated. The State offered no testimony on this. This was an old Nisan truck that overheated on November 6, 2012, causing Appellant to have to borrow Aretha's car that night. It was in no condition to make the kind of drive that would have been required to carry out the State's theory of the case. (16 R.R. 98-99). It was shown at trial that Appellant did not have access to any other vehicles during the time of Alicia's disappearance, thereby making it impossible to carry out this act. Appellant certainly had no access to a white Lincoln that was observed at the scene where the body was found.

(17 R.R. 165). Furthermore, the State failed to do a thorough search of the most obvious place to look—the very home Alicia was living in. The Ranger is not aware of any extensive search like the one that was conducted on Appellant's home being conducted on the home at 1900 Gibbons. (17 R.R. 157). The Ranger, who was the lead investigator on the case, had no knowledge of anyone searching the Gibbons home for any spray paint, weapons, ligatures, blood or DNA evidence, silver metal hasps, receipts to the trunk or hasp, bedding and sheets. (17 R.R. 157-158). He further stated that Alicia's bed was not searched to see if there were signs of any sexual activity in it. (17 R.R. 189). This level of investigation was unacceptable, and the jury could not have rationally found Appellant guilty of capital murder without having had these items analyzed and these questions answered.

### Lesser Offense of Sexual Assault and Possible Contamination of DNA Evidence

At best, the State's evidence proved that Appellant had consensual sex with Alicia. That is why the jury was submitted a lesser included offense of sexual assault as follows: "….[Appellant] did intentionally or knowingly cause the penetration of the anus or sexual organ of [Alicia], a child, by any means, then you will find the Defendant guilty of the lesser offense sexual assault." (C.R. 202). At worst, the jury should have found Appellant not guilty of capital murder and guilty of sexual assault. Under no reasonable interpretation of the evidence in this case did the State prove all the elements of capital murder beyond a reasonable doubt—namely, that Appellant did intentionally cause the death of Alicia by strangulation with an object unknown to the grand jury, and the Appellant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault of Alicia. Supporting this argument, aside from the

43

lack of eyewitness, the lack of any communication between Appellant and Alicia to arrange this meeting, and any evidence of Alicia's DNA at his home or in his vehicle, is the lack of evidence that Alicia defended herself against Appellant. The lab found no DNA from Appellant under the nails of Alicia. (18 R.R. 112). It would be reasonable to assume that if Appellant had taken Alicia and he had attacked her in this manner, that she would have defended herself and that would lead to the potential of his DNA being under her nails. However this is not the case. Possibly the most damning evidence that Alicia was murdered is the black whicker trunk her body was found in. Whoever placed her body in that trunk is undoubtedly the killer. There jury heard no evidence that connected Appellant to that trunk—no fingerprints, no DNA, no paper trail linking Appellant to it, no evidence from police or family members that they had even seen Appellant with that trunk in his home or anywhere else. (17 R.R. 109; 18 R.R. 70-117). It is possible that the person that actually killed Alicia did not leave his DNA. (17 R.R. 192).

If Appellant merely had consensual sex with Alicia, as a reasonable interpretation of the evidence supports, this would not be Aggravated Sexual Assault, it would merely be sexual assault (*compare* Texas Penal Code §22.011, Sexual Assault, to Texas Penal Code §22.021, Aggravated Sexual Assault), because Alicia was 16, and not younger than 14. However, even the evidence supporting a sexual assault conviction is dubious because of the very real risk of contamination of the DNA evidence. Amber Moss, a forensic scientist, received and tested a sexual assault kit taken from the body of Alicia by SWIFS and a testing of the vaginal swabs showed that the "DNA profile from the sperm fraction was consistent with a mixture from the victim and the suspect [Appellant]." (18 R.R. 78-96). She testified that all other males that were tested were

44

excluded as contributors. (18 R.R. 96, 102). However, it is important to note that she did not receive nor test samples from Omes and Adrian Gray. (18 R.R. 109). As previously discussed, the police had credible information that these men were responsible for Alicia's murder—so credible that the police got a search warrant for the white Lincoln like the one spotted at location where her body was found. What should have also been alarming to the jury was that Moss testified that "the debris swabs from…around the nipples from the victim we obtained a partial DNA profile from that sample that was consistent with the mixture from the victim and a second contributor, but due to that second contributor being so minor, we're not able to make any comparisons to that second contributor." (18 R.R. 101). This leads to the possibility that the State had a DNA profile from the actual killer but was unable to identify that person because of the state of that sample. Another concern that the jury should have taken more seriously is the risk that the sample received in the lab were compromised prior to their arrival. Moss confirmed that contamination of the tested samples is possible, and "for it to…have been contaminated, it would have had to been prior to us receiving it at the laboratory, so— because it was properly sealed when we received it at the laboratory." (18 R.R. 104). We know that at least one TXDOT employee had access to the body before the arrival of the police and before the scene was secured. (17 R.R. 23). We also know that the first officer on the scene handled the body without gloves. (17 R.R. 111). Lana Goddard, who was in charge of the Van Zandt County Sheriff's Office property room and who handled the SANE kit (S.E. No. 74) prior to its submission to the lab, admitted that she could not tell the jury what anybody else did with the evidence while it was not in her custody. (18 R.R. 50-51). So if this key item of evidence was tampered with in anyway,

the jury was not given this information. Kristy Holt, who received possession of the SANE kit, took the kit to the Van Zandt County Sheriff's office for storage, rather than delivering it directly to the lab, and thereby increasing the risk of additional exposure contamination and / or tampering. (18 R.R. 33). By allowing this key item of evidence to be kept out of her sight before being delivered to the lab, increased the likelihood that it was tampered with. As such, this evidence was not trustworthy, and the jury should not have given it the weight they did. For all intents and purposes, the jury used this item of evidence alone to convict the Appellant of capital murder. There is no way that a rational jury could have made that kind of leap with that little evidence. The evidence was legally insufficient.

With all these other viable suspects, the sheer lack of any link between Appellant and the abduction, strangling, and murder of Alicia, and the incredibly risky behavior Alicia was engaging in, there is no rational reason how this jury could have not found this evidence to be reasonable doubt and acquitted Appellant of capital murder. The jury simply did not have the evidence is needed to find the elements of capital murder. As such, the evidence was legally insufficient for the jury to convict Appellant of capital murder and Appellant should be rewarded a new trial in this matter.

Appellant asserted legal insufficiency in his Motion for New Trial and Motion in Arrest of Judgment. (2 C.R. 72). Appellant's motion was denied pursuant to T.R.A.P 21.8 when the Court did not timely rule on the motion within 75 days.

Upon the argument and authorities stated, and upon a review of all the evidence, Appellant believes that the evidence in this case was legally insufficient, and requests the case be remanded to the trial court for a new trial.

**ISSUE NUMBER 2**

Because the State's capital murder case was a circumstantial evidence case, and because Appellant had no motive to murder Alicia, the evidence presented supports an inference other than the guilt of Appellant and the jury's finding of guilt was not a rational finding.

**Argument and Analysis**

Appellant acknowledges that it is not necessary to show motive in order to sustain a conviction for murder. *Garcia v. State*, 495 S.W.2d 257 (Tex.Cr.App.1973). However, that is not to say that, in circumstantial evidence cases, the presence or absence of motive on the part of the accused is a fact that may not be considered by the jury. It should be considered by the jury. *Williams v. State*, 840 S.W.2d 449, 460 (Tyler App.1991) (pet. denied). Indeed, the proof of motive in a circumstantial evidence case may supply the cement that binds the other facts and circumstances together so that those circumstances exclude to a "moral certainty"[8] any "reasonable hypothesis" except the guilt of the accused. *Id.* On the other hand, when motive is not shown and the circumstantial evidence raises a reasonable hypothesis exculpating the accused, the other facts and circumstances may or may not be sufficiently strong, in the absence of proof of motive, to exclude to a moral certainty that reasonable hypothesis. Utilizing the foregoing analysis in the application of the standard of review prescribed in *Jackson v. Virginia,* 443 U.W. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the reviewing court must determine whether "the evidence supports an inference other than the guilt of the [accused]...." If it does, the "finding of guilt beyond a reasonable doubt is not a rational finding." *Id.* citing *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Cr.App.1983) (quoted with approval in *Skelton v. State*, 795 S.W.2d 162, 167 (TexCr.App.1989). It is also clear that

47

"if the conclusion [of guilt] is warranted by the combined and cumulative force of all the incriminating circumstances," the conviction should be upheld, and such a determination is to be made on a case-by-case basis. *Id.* at 461 citing *Flores v. State,* 551S.W.2d 364, 367 (Tex.Cr.App.1977).

In *Carlsen v. State*, 654 S.W.2d 444, 448-449 (Tex.Cr.App.1983) (Opinion on State's Motion for Rehearing), the court wrote that although the evidence in circumstantial evidence cases is not to be tested by an "ultimate" standard different from the standard of review applicable to direct evidence cases, the "exclusion of outstanding reasonable hypotheses" analysis is to be applied to determine the sufficiency of the evidence in circumstantial evidence cases, thereby calling forth the *Jackson v. Virginia* standard of review. *Id.* citing 654 S.W.3d at 449. This analysis requires "a process of elimination" of the guilt of those other than the accused in order to "effectively conclude [that] the evidence rationally establishe[s] [the accused's] guilt beyond a reasonable doubt." *Id.* citing 654 S.W.3d at 449; *Carlsen* and its progeny, e.g., *Skelton v. State*, 795 S.W.2d 162, 167 (Tex.Cr.App.1989), *Brandley v. State*, 691 S.W.2d 699, 703-704 (Tex.Cr.App.1985), and *Denby v. State*, 654 S.W.2d 457, 464 (Tex.Cr.App.1983), teach that, in applying this "utilitarian" analysis, the evidence is reviewed in the light most favorable to the verdict. *Id.* A corollary to the above analysis, as previously mentioned, is that "if the evidence supports an inference other than the guilt of the [accused], a finding of guilt beyond a reasonable doubt is not a rational finding." *Id.* citing *Skelton v. State*, 795 S.W.2d at 167 (quoting *Denby v. State*, 654 S.W.2d at 464); *Brandley,* 691 S.W.2d at 703-704; see also *Carlsen v. State,* 654 S.W.2d at 449.

Although the State had direct evidence of Appellant's DNA, which arguably

could have supported a jury verdict on the lesser offense of sexual assault, the evidence the State presented as to the elements of capital murder was entirely circumstantial. As previously discussed, the state had no eyewitness who had seen Appellant and Alicia together, nothing to link Appellant to Alicia's abduction, no witness or documents linking Appellant to the black whicker trunk her body was found in, no link of Appellant to the crime scene, and no evidence—blood, DNA, or otherwise—of Alicia ever being in Appellant's home or vehicle during the time of her disappearance. Furthermore, the State presented no evidence whatsoever of any motive Appellant had to kill Alicia—in fact, the evidence was entirely to the contrary, that Appellant was a gay man, who cared for his family, and cared for Alicia. (16 R.R. 96-97, 102, 112-115, 142, 229, 252-253). The State acknowledged it had no motive for this crime in the District Attorney's closing argument: "Do I have to prove motive? I do not have to prove motive….Would I like to prove motive? You bet your bottom dollar I would. Why wouldn't I want to do that? Because I want to give you the tools to make your job easier. How many times have you set out to do something and realized I don't have the right tools to do this. It makes the job a little bit harder." (18 R.R. 84-85) Then the prosecutor goes on to argue the DNA evidence again, but makes no assertion that the State has given any indication of a motive in the case. (18 R.R. 85).

Appellant argued the lack of motive in his closing argument. (18 R.R. 65-67). Appellant also argued that others, Terry Ramsire and Mike Wofford, did have motive to murder Alicia. The evidence proved that men other than Appellant appeared much more culpable than Appellant, and those men include Terry Ramsire, Kenneth Byrd, Mike Wofford, Omes Gray, Adrian Gray, and Dee Williams. (*see* the "Additional Suspect"

portion of Appellant's Issue No. 1). Insufficient evidence was provided by the State to rule these suspects out as the murderer of Alicia. The evidence clearly supports an inference other than the guilt of Appellant, and other men cannot be eliminated as the killer of Alicia. The circumstantial evidence the State submitted is insufficient to exclude to a moral certainty the State's hypothesis that Appellant committed capital murder. In fact, the evidence suggested a reasonable hypothesis that someone other than Appellant murdered Alicia. Therefore, no rational juror could have found the elements of the offense of capital murder beyond a reasonable doubt. *Jackson v. Virginia.* Based upon the foregoing, the case should be reversed and the case should be remanded to the trial court for a new trial.

## ISSUE NUMBER 3

Issue Number 3: The aggregate effect of erroneous rulings by the trial court in allowing the jury to hear objectionable and inadmissible evidence irreparably harmed Appellant and Appellant should be granted a new trial.

### Argument and Analysis

It is Appellant's position that the trial court committed multiple errors over the course of the trial in allowing evidence to be introduced by the State over the objection of Appellant. While each of these errors was harmful to Appellant in its own right, when viewed cumulatively, they unquestionable affected his substantial rights. It is established that errors may be harmful in their cumulative effect even if harmless when separately considered. *Stahl v. State*, 749 S.W.2d 826 (Tex.Crim.App.1988).

Appellant objected to the admission of Appellant's phone records, State's Exhibit 27. (18 R.R. 62-67). Appellant argued the records contained hearsay, and that even

50

though the State had filed a business record affidavit with the documents prior to trial, the documents still contained inadmissible hearsay and that Ranger Adcock should not be allowed to testify about information contained in the records. The Court improperly admitted this evidence over objection from Appellant and allowed the Ranger to testify to the records. This harmed Appellant's substantial rights in that it allowed the State to argue that Appellant's lack of call activity was somehow an indication of his guilt, and thereby harming Appellant. (19 R.R. 87-88). Furthermore, after the admission of the evidence, the State asked the Ranger: "Is that [the phone records] evidence at all for you in your investigation? A: No, sir." (17 R.R. 83). At that point Appellant moved for a mistrial based upon the State's request for the admission of irrelevant evidence, and the Court erroneously overruled the motion for mistrial. (17 R.R. 84) Under Texas Rules of Evidence Rule 402, "Evidence which is not relevant is inadmissible." A Court's denial of a motion for mistrial is reviewed under an abuse of discretion standard, and her ruling must be upheld if it was in the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex.Crim.App. 2010). Allowing this evidence in the first place and then denying the mistrial was an abuse of discretion. The effect of the Court allowing the case to continue with irrelevant evidence being introduced by the State harmed Appellant in that he had to devote valuable trial time to cross-examining the Ranger regarding the phone records and arguing to the jury about the records. Additionally, this ruling harmfully affected the substantial rights of Appellant and affected the outcome of the trial.

Another error was the admission of a recorded statement that Appellant gave to CBS radio reporter L.P. Phillips (S.E. No. 76). Appellant objected under T.R.E. 403 to a

false statement made by Appellant during the interview in which he stated that the police found hair evidence during the search of his truck. (S.E. No. 76; 18 R.R. 54-58). T.R.E. 403 provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." It was established through the testimony of the Ranger that no evidence was found during the search of Appellant's truck. (17 R.R. 141, 151; 18 R.R. 114). Appellant objected to the admission of this evidence at the time it was offered. (18 R.R. 66). By allowing the jury to hear Appellant say something that was inconsistent with the evidence, when he clearly was mistaken, resulted in misleading the jury and creating confusion about the State of the evidence. It also cast Appellant in a negative light in front of the jury and probably led to speculation from the jury that evidence had been found that they were not being told about. Hearing Appellant admit that evidence was found in his truck created a very real danger of unfair prejudice that outweighed any possible probative value that this portion of Appellant's statement had. Appellant argued that because this was a misunderstanding and untrue, that this statement had no probative value. Appellate Courts review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard to determine whether the decision was outside the zone of reasonable disagreement. *Montgomery v. State*, 820 S.W.2d 372, 378-79 (Tex.Crim.App.1990). If the Court determines that error was committed, a harm analysis must then be conducted. The Court of Criminal Appeals has instructed courts of appeals that, when conducting a harm analysis under Texas Rule of Appellate Procedure 44.2(b), "an appellate court need only determine whether or not the error affected a substantial

52

right of the defendant. To make this determination, appellate courts must decide whether the error had a substantial or injurious effect on the jury verdict." *Llamas v. State*, 12 S.E.3d 469, 471 n. 2 (Tex. Crim.App.2000). Substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have a fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 353, 355 (Tex.Crim.App.2002). Appellant's position is that allowing this wrongful assertion from Appellant was harmful and did have a substantial or injurious effect on the jury verdict. The jury could have easily believed that based upon this statement there was evidence linking Alicia to Appellant's vehicle during the time of her disappearance, and this would be all the belief they need to turn a very weak State's case into a guilty verdict.

An additional error committed by the Court during the trial was the admission of State's Exhibit 28, a WFAA Channel 8 news report in which Appellant was interviewed. The Court initially kept this evidence out on authentication grounds. (17 R.R. 67). Then, when Ranger Adcock was on the stand, the State again attempted to introduce the recording through him as the sponsoring witness. (17 R.R. 67). Appellant objected on the grounds that (1) the Ranger did not create the recording and could not properly be the sponsoring witness for it, (2) The Ranger had no way of knowing if this the was full and accurate copy of the original recording made by the news station—and if introduced Appellant should be entitled to the full recording; and (3) under T.R.E. 901, the State could not properly meet the requirements of authentication of this exhibit through this witness. (17 R.R. 69). Appellant also made other objections, including an objection under T.R.E. 403 in that the prejudice that this exhibit would cause Appellant would

53

substantially outweigh any probative value. (17 R.R. 79). A Voir Dire examination of the Ranger was then held. (17 R.R. 72-79). Among other things, the Ranger admitted that he could not testify that this was an accurate and authentic recording of the original footage. (17 R.R. 77). The Court wrongfully overruled Appellant's objections and admitted the exhibit. (17 R.R. 78-79). The admission of this evidence harmed Appellant because it allowed the State to argue that Defendant was cold in the interview and this was a sign of guilt. The District Attorney made the following argument in his closing argument based upon this exhibit:

> "[Appellant's] statement to the news media, 'I'm over it,' he says this in February. 'I'm over it.' …Did you hear any other family members say that they're over it, it's time to move on?....It could be consistent with guilt. It could be that he's over it because he's been grieving a lot longer than they have because he killed her."
> (19 R.R. 91).

As a result, Appellant had to spend valuable time in his cross-examination and in his closing argument responding to this, and thus detracting from more important matters. (19 R.R. 71). The erroneous introduction of this evidence was harmful, and error had a substantial effect on the jury verdict.

Although each of these errors harm Appellant and substantially affected the jury verdict and thus should result in a new trial being granted on their own merit, the cumulative effect of these errors was overwhelming prejudicial to Appellant. *Stahl v. State*. The errors led the jury to find Appellant guilty for capital murder when the elements had not been proven beyond a reasonable doubt. For this reason, Appellant should be given a new trial in this matter.

**CONCLUSION AND PRAYER**

WHEREFORE, Appellant prays the judgment of conviction be reversed and the case remanded back to the trial court for a new trial and for such other and further relief to which Appellant may be justly entitled.

Respectfully Submitted,

   /s/ John A. Scott
**JOHN A. SCOTT**
State Bar No. 24034672
107 E. Tyler St.
Athens, Texas 75751
(903) 675-8005
Fax: 903-675-8006

*Counsel for Appellant*

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing instrument has been delivered by email to Appellee's attorney of record:

Mr. Chris Martin
Van Zandt County District Attorney
400 South Buffalo
Canton, Texas 75103

   /s/   John A. Scott
**JOHN A. SCOTT**
107 E. Tyler St.
Athens, Texas 75751
(903) 675-8005 (phone)
(903) 675-8006 (fax)
TBC No. 24034672

Date: September 30, 2015

## CERTIFICATE OF COMPLIANCE

Relying on the word count function in the word processing software used to produce this document, I certify that the number of words in this reply (excluding any caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix) is 14,840 (The limit is 15,000).

Signed this the **30th** day of **September**, 2015

/s/ John A. Scott
John A. Scott
ATTORNEY FOR APPELLANT

# APPENDIX

**TEX PE. CODE ANN. § 19.03 : Texas Statutes - Section 19.03: CAPITAL MURDER**

(a) A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and:

(1) the person murders a peace officer or fireman who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman;

(2) the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat under Section 22.07(a)(1), (3), (4), (5), or (6);

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration;

(4) the person commits the murder while escaping or attempting to escape from a penal institution;

(5) the person, while incarcerated in a penal institution, murders another:

(A) who is employed in the operation of the penal institution; or

(B) with the intent to establish, maintain, or participate in a combination or in the profits of a combination;

(6) the person:

(A) while incarcerated for an offense under this section or Section 19.02, murders another; or

(B) while serving a sentence of life imprisonment or a term of 99 years for an offense under Section 20.04, 22.021, or 29.03, murders another;

(7) the person murders more than one person:

(A) during the same criminal transaction; or

(B) during different criminal transactions but the murders are committed pursuant to the same scheme or course of conduct;

(8) the person murders an individual under six years of age; or

(9) the person murders another person in retaliation for or on account of the service or status of the other person as a judge or justice of the supreme court, the court of criminal appeals, a court of appeals, a district court, a criminal district court, a constitutional county court, a statutory county court, a justice court, or a municipal court.

(b) An offense under this section is a capital felony.

(c) If the jury or, when authorized by law, the judge does not find beyond a reasonable doubt that the defendant is guilty of an offense under this section, he may be convicted of murder or of any other lesser included offense.

Added by Acts 1973, 63rd Leg., p. 1123, ch. 426, art. 2, Sec. 1, eff. Jan. 1, 1974.
Amended by Acts 1983, 68th Leg., p. 5317, ch. 977, Sec. 6, eff. Sept. 1, 1983; Acts 1985, 69th Leg., ch. 44, Sec. 1, eff. Sept. 1, 1985; Acts 1991, 72nd Leg., ch. 652, Sec. 13, eff. Sept. 1, 1991; Acts 1993, 73rd Leg., ch. 715, Sec. 1, eff. Sept. 1, 1993; Acts 1993, 73rd Leg., ch. 887, Sec. 1, eff. Sept. 1, 1993; Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994; Acts 2003, 78th Leg., ch. 388, Sec. 1, eff. Sept. 1, 2003.
Amended by:
Acts 2005, 79th Leg., Ch.

**TEX PE. CODE ANN. § 22.011. SEXUAL ASSAULT.** (a) A person commits an offense if the person:

(1) intentionally or knowingly:

(A) causes the penetration of the anus or sexual organ of another person by any means, without that person's consent;

(B) causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or

(C) causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; or

(2) intentionally or knowingly:

(A) causes the penetration of the anus or sexual organ of a child by any means;

(B) causes the penetration of the mouth of a child by the sexual organ of the actor;

(C) causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;

(D) causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or

(E) causes the mouth of a child to contact the anus or sexual organ of another person, including the actor.

(b) A sexual assault under Subsection (a)(1) is without the consent of the other person if:

(1) the actor compels the other person to submit or participate by the use of physical force or violence;

(2) the actor compels the other person to submit or participate by threatening to use force or violence against the other person, and the other person believes that the actor has the present ability to execute the threat;

(3) the other person has not consented and the actor knows the other person is unconscious or physically unable to resist;

(4) the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it;

(5) the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring;

(6) the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge;

(7) the actor compels the other person to submit or participate by threatening to use force or violence against any person, and the other person believes that the actor has the ability to execute the threat;

(8) the actor is a public servant who coerces the other person to submit or participate;

(9) the actor is a mental health services provider or a health care services provider who causes the other person, who is a patient or former patient of the actor, to submit or participate by exploiting the other person's emotional dependency on the actor;

(10) the actor is a clergyman who causes the other person to submit or participate by exploiting the other person's emotional dependency on the clergyman in the clergyman's professional character as spiritual adviser; or

(11) the actor is an employee of a facility where the other person is a resident, unless the

employee and resident are formally or informally married to each other under Chapter 2, Family Code.

(c)  In this section:

(1)  "Child" means a person younger than 17 years of age.

(2)  "Spouse" means a person who is legally married to another.

(3)  "Health care services provider" means:

(A)  a physician licensed under Subtitle B, Title 3, Occupations Code;

(B)  a chiropractor licensed under Chapter 201, Occupations Code;

(C)  a physical therapist licensed under Chapter 453, Occupations Code;

(D)  a physician assistant licensed under Chapter 204, Occupations Code;  or

(E)  a registered nurse, a vocational nurse, or an advanced practice nurse licensed under Chapter 301, Occupations Code.

(4)  "Mental health services provider" means an individual, licensed or unlicensed, who performs or purports to perform mental health services, including a:

(A)  licensed social worker as defined by Section 505.002, Occupations Code;

(B)  chemical dependency counselor as defined by Section 504.001, Occupations Code;

(C)  licensed professional counselor as defined by Section 503.002, Occupations Code;

(D)  licensed marriage and family therapist as defined by Section 502.002, Occupations Code;

(E)  member of the clergy;

(F)  psychologist offering psychological services as defined by Section 501.003, Occupations Code;  or

(G)  special officer for mental health assignment certified under Section 1701.404, Occupations Code.

(5)  "Employee of a facility" means a person who is an employee of a facility defined by Section 250.001, Health and Safety Code, or any other person who provides services for a facility for compensation, including a contract laborer.

(d)  It is a defense to prosecution under Subsection (a)(2) that the conduct consisted of medical care for the child and did not include any contact between the anus or sexual organ of the child and the mouth, anus, or sexual organ of the actor or a third party.

(e)  It is an affirmative defense to prosecution under Subsection (a)(2):

(1)  that the actor was the spouse of the child at the time of the offense; or

(2)  that:

(A)  the actor was not more than three years older than the victim and at the time of the offense:

(i)  was not required under Chapter 62, Code of Criminal Procedure, to register for life as a sex offender; or

(ii)  was not a person who under Chapter 62, Code of Criminal Procedure, had a reportable conviction or adjudication for an offense under this section; and

(B)  the victim:

(i)  was a child of 14 years of age or older; and

(ii)  was not a person whom the actor was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under Section 25.01.

(f)  An offense under this section is a felony of the second degree, except that an offense under this section is a felony of the first degree if the victim was a person whom the actor

60

was prohibited from marrying or purporting to marry or with whom the actor was prohibited from living under the appearance of being married under Section 25.01.

Added by Acts 1983, 68th Leg., p. 5312, ch. 977, Sec. 3, eff. Sept. 1, 1983. Amended by Acts 1985, 69th Leg., ch. 557, Sec. 1, eff. Sept. 1, 1985; Acts 1987, 70th Leg., ch. 1029, Sec. 1, eff. Sept. 1, 1987; Acts 1991, 72nd Leg., ch. 662, Sec. 1, eff. Sept. 1, 1991; Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994; Acts 1995, 74th Leg., ch. 273, Sec. 1, eff. Sept. 1, 1995; Acts 1995, 74th Leg., ch. 318, Sec. 6, eff. Sept. 1, 1995; Acts 1997, 75th Leg., ch. 1031, Sec. 1, 2, eff. Sept. 1, 1997; Acts 1997, 75th Leg., ch. 1286, Sec. 1, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 1102, Sec. 3, eff. Sept. 1, 1999; Acts 1999, 76th Leg., ch. 1415, Sec. 24, eff. Sept. 1, 1999; Acts 2001, 77th Leg., ch. 1420, Sec. 14.829, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 155, Sec. 1, 2, eff. Sept. 1, 2003; Acts 2003, 78th Leg., ch. 528, Sec. 1, eff. Sept. 1, 2003; Acts 2003, 78th Leg., ch. 553, Sec. 2.017, eff. Feb. 1, 2004.

Amended by:

Acts 2005, 79th Leg., Ch. 268 (S.B. 6), Sec. 4.02, eff. September 1, 2005.
Acts 2009, 81st Leg., R.S., Ch. 260 (H.B. 549), Sec. 3, eff. September 1, 2009.
Acts 2009, 81st Leg., R.S., Ch. 260 (H.B. 549), Sec. 4, eff. September 1, 2009.

**TEX PE. CODE ANN. § 22.021.  AGGRAVATED SEXUAL ASSAULT.**  (a)  A person commits an offense:

(1)  if the person:

(A)  intentionally or knowingly:

(i)  causes the penetration of the anus or sexual organ of another person by any means, without that person's consent;

(ii)  causes the penetration of the mouth of another person by the sexual organ of the actor, without that person's consent; or

(iii)  causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor; or

(B)  intentionally or knowingly:

(i)  causes the penetration of the anus or sexual organ of a child by any means;

(ii)  causes the penetration of the mouth of a child by the sexual organ of the actor;

(iii)  causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor;

(iv)  causes the anus of a child to contact the mouth, anus, or sexual organ of another person, including the actor; or

(v)  causes the mouth of a child to contact the anus or sexual organ of another person, including the actor; and

(2)  if:

(A)  the person:

(i)  causes serious bodily injury or attempts to cause the death of the victim or another person in the course of the same criminal episode;

(ii)  by acts or words places the victim in fear that any person will become the victim of an offense under Section 20A.02(a)(3), (4), (7), or (8) or that death, serious bodily injury, or kidnapping will be imminently inflicted on any person;

(iii)  by acts or words occurring in the presence of the victim threatens to cause any person to become the victim of an offense under Section 20A.02(a)(3), (4), (7), or (8) or to cause the death, serious bodily injury, or kidnapping of any person;

(iv)  uses or exhibits a deadly weapon in the course of the same criminal episode;

(v)  acts in concert with another who engages in conduct described by Subdivision (1) directed toward the same victim and occurring during the course of the same criminal episode; or

(vi)  administers or provides flunitrazepam, otherwise known as rohypnol, gamma hydroxybutyrate, or ketamine to the victim of the offense with the intent of facilitating the commission of the offense;

(B)  the victim is younger than 14 years of age; or

(C)  the victim is an elderly individual or a disabled individual.

(b)  In this section:

(1)  "Child" has the meaning assigned by Section 22.011(c).

(2)  "Elderly individual" and "disabled individual" have the meanings assigned by Section 22.04(c).

(c)  An aggravated sexual assault under this section is without the consent of the other person if the aggravated sexual assault occurs under the same circumstances listed in Section 22.011(b).

(d)  The defense provided by Section 22.011(d) applies to this section.

(e)  An offense under this section is a felony of the first degree.

(f)  The minimum term of imprisonment for an offense under this section is increased to 25 years if:

(1)  the victim of the offense is younger than six years of age at the time the offense is committed; or

(2)  the victim of the offense is younger than 14 years of age at the time the offense is committed and the actor commits the offense in a manner described by Subsection (a)(2)(A).

Added by Acts 1983, 68th Leg., p. 5312, ch. 977, Sec. 3, eff. Sept. 1, 1983.  Amended by Acts 1987, 70th Leg., ch. 573, Sec. 1, eff. Sept. 1, 1987;  Acts 1987, 70th Leg., 2nd C.S., ch. 16, Sec. 1, eff. Sept. 1, 1987;  Acts 1993, 73rd Leg., ch. 900, Sec. 1.01, eff. Sept. 1, 1994;  Acts 1995, 74th Leg., ch. 318, Sec. 7, eff. Sept. 1, 1995;  Acts 1997, 75th Leg., ch. 1286, Sec. 2, eff. Sept. 1, 1997;  Acts 1999, 76th Leg., ch. 417, Sec. 1, eff. Sept. 1, 1999;  Acts 2001, 77th Leg., ch. 459, Sec. 5, eff. Sept. 1, 2001;  Acts 2003, 78th Leg., ch. 528, Sec. 2, eff. Sept. 1, 2003;  Acts 2003, 78th Leg., ch. 896, Sec. 1, eff. Sept. 1, 2003.

Amended by:

Acts 2007, 80th Leg., R.S., Ch. 593 (H.B. 8), Sec. 1.18, eff. September 1, 2007.

Acts 2011, 82nd Leg., R.S., Ch. 1 (S.B. 24), Sec. 6.05, eff. September 1, 2011.

**TEXAS RULES OF EVIDENCE, Rule 402 RELEVANT EVIDENCE GENERALLY ADMISSIBLE; IRRELEVANT EVIDENCE INADMISSIBLE**

All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible.

**TEXAS RULES OF EVIDENCE, Rule 403 EXCLUSION OF RELEVANT EVIDENCE ON SPECIAL GROUNDS**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

**TEXAS RULES OF EVIDENCE, Rule 901 REQUIREMENT OF AUTHENTICATION OR IDENTIFICATION**

(a)    General Provision. --The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b)    Illustrations. --By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1)    Testimony of witness with knowledge. --Testimony that a matter is what it is claimed to be.

(2)    Nonexpert opinion on handwriting. --Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.

(3)    Comparison by trier or expert witness. --Comparison by the trier of fact or by expert witness with specimens which have been found by the court to be genuine.

(4)    Distinctive characteristics and the like. --Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with

circumstances.

(5) Voice identification. --Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at anytime under circumstances connecting it with the alleged speaker.

(6) Telephone conversations. --Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if:

(A) in the case of a person, circumstances, including self-identification, show the person answering to be the one called; or

(B) in the case of a business, the call was made to a place of business and the conversation related to business reasonably transacted over the telephone.

(7) Public records or reports. --Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

(8) Ancient documents or data compilation. --Evidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence twenty years or more at the time it is offered.

(9) Process or system. --Evidence describing a process or system used to produce a result and showing that the process or system produces an accurate result.

(10) Methods provided by statute or rule. --Any method of authentication or identification provided by statute or by other rule prescribed pursuant to statutory authority.